# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:22-cr-121 |
| | ) | |
| JULIO CESAR ALVARADO DUBON, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

Three officers with the Richmond Police Department approached the defendant's residence and knocked on his door after receiving a tip that an individual at the defendant's residence was planning a mass shooting. The officers knocked on the door and, after about one minute, encountered the defendant. The defendant agreed to allow the officers to come into his residence and opened the door to allow them to do so. After entering the residence, the officers soon noticed that there was ammunition and gun paraphernalia, namely magazines and a rifle round, present in the living room that they entered. After some initial conversation about whether the defendant was or knew the individual that the officers were looking for, the officers told the defendant that they were going to check to make sure that no one else was in the house. The defendant told them to "go ahead and check." One officer then proceeded to perform a quick sweep of the residence to check if any other individuals were present. After only seconds into the sweep, one of the officers saw in a bedroom what appeared to be one of the guns described in the tip that could be used to perform the mass shooting. The defendant then accompanied the officer to the bedroom and directed him to the location of two other firearms in the bedroom.

After telling the officers to "go ahead and check" the residence for other individuals in the residence, the defendant never told the officers to leave, stop checking for other individuals, or

1

otherwise protested the officers' actions.  To the contrary, the defendant accompanied one of the officers to a bedroom in the residence and showed the officers other firearms in the residence.  The defendant also directed the officers where his identification was present in the residence.  In sum, the defendant consented to and complied with the officer's attempts to locate others and firearms in the residence.

As a result, the officers did not violate the Fourth Amendment to the United States Constitution and the United States urges the Court to deny Julio Cesar Alvarado Dubon's Motion to Suppress (ECF 25) because the evidence recovered by law enforcement on July 1, 2022, from Dubon's residence was lawfully obtained.

## I.     FACTUAL BACKGROUND

On or about July 1, 2022, the Richmond Police Department (RPD) received a tip that a man who went by the name "Chapin" possessed firearms, specifically rifles, and was planning a mass shooting on July 4, 2022. The tipster described two rifles: one was equipped with a red dot sight and the other was equipped with a bipod stand and had several holes in its side.  After additional investigation, RPD identified this individual and a potential residence for the suspect at 3112 Columbia Street, Richmond, Virginia.

That same day, at approximately 11:00 pm, Officer Ferreiras, Detective Kiniry, and Detective Sergeant Rogers traveled to the Columbia Street address to conduct a "knock and talk" encounter with the suspect.[1]   After knocking on the door for approximately one minute, the defendant, Julio Cesar Alvarado-Dubon (the "defendant" or "Dubon") came to the door and

---

[1]     The encounter between the officers and the defendant is captured, in part, on the body worn camera footage from a body camera worn by Officer Ferreiras.  The United States will submit a copy of this footage to the Court for *in camera* review on October 3, 2022.  All references herein to the body worn camera footage will be cited as (U.S. Ex. 1 at [time stamp]).

opened it to speak with the officers. (U.S. Ex. 1 at 1:50.)[2] When the defendant spoke with Officer Ferreiras at the front door, Officer Ferreiras asked the defendant whether the officers could come inside to speak with him.[3] The defendant agreed to allow the officers into the residence. Upon entry, the officers entered the living room of the residence. Detective Kiniry noticed in plain view two Glock magazines and a rifle round on a cabinet on the right side of the room as Detective Kiniry entered the residence. Additionally, when the officers entered the residence, they noticed another individual who appeared to be entering the living room from another room toward the rear of the residence. The officers presented the defendant with a photo that the officers suspected was the person who threatened the mass shooting. The defendant denied recognizing the person in the photo. (*See* U.S. Ex. 1 at 2:30-3:10.) Similarly, the second individual in the living room denied that he was the person in the photo. (Id.) Nevertheless, after examining the photo and the second individual who entered the living room, the officers confirmed that the person in their photo was the second person who entered the living room. (U.S. Ex. 1 at 3:20-3:40.) That person was identified as Rolman Balacarcel, also known as "Chapin."

Through Officer Ferreiras, Detective Kiniry asked the defendant whether there were any firearms in the residence and whether anyone else was in the residence. (U.S. Ex. 1 at 3:40-3:58.) The defendant denied that anyone else was in the residence. Detective Kiniry then asked Officer Ferreiras to tell the defendant that he was going to check to see if anyone else was in the residence. (U.S. Ex. 1 at 3:48-4:04.) Officer Ferreiras then translated that statement to the defendant. (Id.) In response, the defendant said to Officer Ferreiras "chequeen," which when translated to English means "go ahead and check." (U.S. Ex. 1 at 4:00-4:05.) Detective Kiniry then left the area of the

---

[2] Officer Ferreiras who spoke Spanish made first contact with the defendant and would translate any communication between the defendant and the other officers throughout their interaction.
[3] During the conversation between the defendant and Officer Ferreiras at the defendant's front door, a party with loud music was playing outside.

living room and walked toward the rear of the residence where there were bedrooms to check to see if anyone else was in the residence. After Detective Kiniry left the room, the defendant stated in Spanish "Well, I understand you can't get into my house without a warrant then, but…" and trailed off. (U.S. Ex. 1 at 4:07-4:20.) The defendant never protested Detective Kiniry walking through the house to check for others or otherwise asked the officers to leave or stop what they were doing.

Detective Kiniry left the area of the living room at approximately 4:08 seconds on U.S. Exhibit 1. And, approximately 15 seconds later, he reappears from a bedroom to state that he had seen "the rifle," referring to what appeared to be a rifle matching the description given by the tipster. (U.S. Ex. 1 at 4:23-4:50.) The rifle was in plain view in a bedroom and appeared to be standing on a bipod and had holes in the side of the barrel. The defendant stated that the rifle was an air rifle and that he could show the officer that it was an air rifle. (Id.; 4:50-5:20.) The defendant then accompanied Detective Kiniry to the bedroom where Detective Kiniry had seen the rifle matching the description given by the tipster. While in the bedroom with the defendant, Detective Kiniry noticed a loaded rifle magazine next to the closet in the bedroom. He also asked the defendant whether there were any other firearms in the bedroom. The defendant confirmed there were and pointed Detective Kiniry toward the closet. In the closet, Detective Kiniry located a loaded rifle with a scope on it, a Radical Firearms, Model RFS 15 Rifle, serial number RFS04385. Detective Kiniry removed the rifle from the closet and placed it on the bed in the room. Detective Kiniry then asked if there were any pistols in the room, and the defendant directed him toward a drawer where Detective Kiniry located a Glock 26 Gen 5, 9mm Luger, semiautomatic pistol, serial number ADNF440. This firearm was also placed on the bed in the room. Lastly, Detective Kiniry asked the defendant if the defendant had any identification, and the defendant directed Detective

Kiniry to the same closet where the rifled was located. Detective Kiniry found the defendant's Guatemalan passport.

## II.     ARGUMENT

The Fourth Amendment guards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. Amend. IV; *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The hallmark of Fourth Amendment scrutiny is "reasonableness," which is a question of judicial sanction to perform a lawful search or seizure; without such authorization, searches and seizures are presumptively unreasonable. *Katz v. United States*, 389 U.S. 347, 357 (1967). However, there are exceptions to the warrant requirement when the defendant consents to the search or when a protective sweep is justified for officer safety. *See Schneckloth v. Bustamonte*, 412 U.S. 218 (1973); *Maryland v. Buie*, 494 U.S. 325 (1990).

In this case, the defendant consented to the officers checking his residence to see if others were present, allowing the officers to find evidence in plain view that supported their investigation into a potential mass shooting. The defendant further consented to the officer locating other firearms and identification materials in the defendant's bedroom when he directed the officer to the location of the firearms and the identification documents within the bedroom. Additionally, because of the evidence the officers had about a potential mass shooting, the presence of magazines and a rifle round in plain view in the residence, and the fact that the defendant and another individual appeared to have been dishonest about the identity of the mass shooting suspect, the officers were well within the reasonableness standard which undergirds the Fourth Amendment to do a protective sweep of the residence to ensure that no other persons who could pose a threat to the officers was present.

### A. The Defendant Voluntarily Consented to the Officers Looking for Others in His Residence

No warrant is required under the Fourth Amendment when a defendant consents to a search. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Such consent can be either express our implied and it must also be voluntary. *Id.* When evaluating whether consent was given, courts must look to the totality of the circumstances. *Id.* at 224-25. Consent to search can be revoked and, once it is, police may no longer search relying on the prior consent. *United States v. Lattimore*, 87 F.3d 647, 651 (4th Cir. 1996). When a defendant's consent is ambiguous, "courts have generally relied upon the defendant's failure to protest the search in finding consent." *United States v. Barrington*, 210 F. Supp. 2d 773, 778 (E.D. Va. 2002). Likewise, if a defendant's revocation of consent is ambiguous, courts will rely on a failure to protest to find consent. *United States v. Hicks*, 631 F. Supp. 2d 725, 736 (E.D.N.C. 2009) (finding that, because the defendant did not explicitly revoke consent, he did not object to the search); *United States v. Pena*, No. 4:09-CR-00071-H-1, 2009 U.S. Dist. LEXIS 122552, at *24 (E.D.N.C. Dec. 11, 2009) (finding that the defendant's statement that he could not sign the search waiver form was equivocal and did not revoke consent).

In this case, the defendant contends that he never consented to the officers looking through the house. (Def.'s Mot. to Supp. at 7.) However, in taking this position, the defendant ignores his own words. The defendant gave clear consent when he stated "go ahead and check" in response to Officer Ferreiras's statement that the officers were going to check to make sure no one else was in the house. *See supra* at 4. There is no other plausible way to interpret the phrase "go ahead and check" than to conclude that the declarant consents to the officers taking the action they wished to take. Only after the defendant said "go ahead and check" did Detective Kiniry make any movement to look through the residence for other individuals. In doing so, he discovered what he concluded was a firearm that the tipster described in this case.

6

The defendant suggests that his mentioning of his knowledge that the police needed a warrant to check his home indicates a lack of consent. However, this logic fails for several reasons. First, that statement by the defendant followed an unequivocal statement of "go ahead and check." An ambiguous statement about the defendant knowing his rights which follows a clear statement of consent fails to indicate a lack, or withdrawal, of consent. Second, even absent any clear statement by the defendant of "go ahead and check," the defendant's lack of protestations to Detective Kiniry's actions as he moved through the residence to complete the protective sweep indicates that the defendant did consent to the detective's actions. In sum, the defendant's words combined with his actions demonstrate consent to the search.

Further, while the defendant does not explicitly contend in his motion that he operated under some form of coercion or duress, the facts of this case as seen on United States Exhibit 1 eliminate any suggestion that the officers coerced or intimidated the defendant into telling them "go ahead and check" for others in the residence. First, the officers were let into the residence consensually, and the defendant has conceded this point in his motion. (See Def.'s Mot. to Supp. at 2)("Dubon opened the door and allowed the officers into the residence."). There was no evidence of coercion or intimidation from the outset of law enforcement's encounter with the defendant. Second, once in the residence, the officers' tone remained calm and reserved, though they may have had to speak in a louder tone to overcome the noise from outside of the residence. Third, the defendant's movement was never restrained nor was he made to move or answer any question while in the residence. To the contrary, even when the officers are asking questions of the defendant and Balacarcel, the defendant moves freely throughout the living room. (See U.S. Ex. 1 at 4:10-4:30.) Only when Detective Kiniry noticed what appeared to be a firearm in one of the bedrooms did he prevent the defendant from entering the bedroom toward the rear of the house.

Had the defendant been under duress, or operating from a place of fear, coercion, or intimidation, he likely would not have felt free to move around the house as he did. Similarly, if the officers had intended to intimidate the defendant, they would have restricted his movements far sooner.

The facts in this case are analogous to those in *United States v. Gomez-Zunun*, 751 F. App'x 374 (4th Cir. 2018). In *Gomez-Zunun*, four Immigration and Customs Enforcement agents and several police officers knocked on the defendant's door, responding to information that the defendant was in the country illegally and potentially possessed firearms. The defendant's wife allowed them inside and agreed to allow the officers to do a protective sweep "to ensure that no one else was home." *Id.* The Court held that consent was given voluntarily because, although there were multiple armed officers, they were not aggressive or coercive and the defendant's wife was not particularly susceptible to coercion. *Id.* at 377. Three armed officers approached the defendant's door. None of the officers acted aggressively or coercively. The defendant consensually allowed the officers inside and, when they requested to perform a protective sweep of the home, he said "go ahead and check." Like in *Gomez-Zunun*, the evidence shows that the defendant's consent was voluntary.

### B. The Search was a Valid Protective Sweep

"A protective sweep is justified when a reasonably prudent officer would be warranted 'in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene.'" *United States v. Moore*, 477 F. App'x 102, 108 (4th Cir. 2012) (quoting *Maryland v. Buie*, 494 U.S. 325, 334, 110 S. Ct. 1093, 108 L. Ed. 2d 276 (1990)). Such a sweep must be based on specific, articulable facts and it must be only a cursory look to see if anyone else is present. *Buie*, 494 U.S. at 334-35. Any evidence found in plain view during a protective sweep is admissible. *United States v. Green*, 599 F.3d 360, 376 (4th Cir. 2010).

The defendant argues that protective sweeps may only be performed in conjunction with a search incident to arrest, but this is not the case. The Fourth Circuit has noted that "[t]he vast majority of circuit courts to have considered the issue have upheld protective sweeps conducted in non-arrest situations in which officers are lawfully on a defendant's property." *United States v. Portis*, 407 F. App'x 669, 671 (4th Cir. 2011). The Fourth Circuit has affirmed a protective sweep where officers had reason to believe that they were in danger because of a firearm. *Id.; see also United States v. Davis*, 588 F. Supp. 2d 693, 703 (S.D.W. Va. 2008) ("Precluding officers from conducting protective sweeps of residences unless an arrest has occurred disregards the important officer safety interest recognized in Terry and its progeny without good reason, and such a rule could endanger law enforcement officers in some situations."); *United States v. Osiomwan*, No. CRIM. WDQ-12-0265, 2013 WL 2458459, at *7 (D. Md. May 22, 2013), aff'd, 593 F. App'x 194 (4th Cir. 2014) (finding that a protective sweep based on exigent circumstances and not a search incident to arrest was valid). Indeed, the "constitutionality of a protective sweep does not depend on whether that sweep is incidental to a search warrant, an arrest warrant, or a consensual search." *United States v. Starnes*, 2013 WL 6731784 (7th Cir. Dec. 23, 2013); *see also United States v. Crisolis-Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) ("Protective sweeps need not always occur in conjunction with an arrest.")

In order for a protective sweep to be valid, the officers' concern for safety must be based on specific, articulable facts. In *Davis*, 588 F. Supp. 2d 693 (S.D.W. Va. 2008), the court upheld a protective sweep of the defendant's hotel room that occurred during a consensual encounter. The court based its decision upon the following factors: (1) the small hotel room, (2) the officers' belief that the defendant was lying about his identity, (3) the defendant's statement that someone else was in the hotel room, (4) enough time had elapsed for an attack on the officers to be prepared,

9

and (5) the police had no reason to believe that the men in the hotel room were not violent. Other cases have established that the presence of firearms is another factor to consider in whether a protective sweep was warranted. *Portis*, 407 F. App'x 669 at 672 (finding that the officers' belief that the suspect had firearms and had just shot at someone was enough to justify a protective sweep); *United States v. Harris*, No. 4:18-CR-57-FL-1, 2019 U.S. Dist. LEXIS 213768, at *31 (E.D.N.C. Aug. 30, 2019) (considering the fact that officers had information that firearms were present in the house as a part of the justification for the protective sweep).

While the defendant claimed there was no one else in the home, the other factors identified in *Davis* are clear and present in this case. Here, the officers were in a small home with multiple rooms adjoining the living room where they stood with two other individuals. Based on his likeness to a photograph, the officers believed that the other individual in the room, and also potentially the defendant, was lying about his identity and that he was in fact the suspect to whom the officers were looking to speak.[4] Additionally, enough time had elapsed since the officers entered the residence for an attack on them to be prepared and they had no reason to believe that either of the men were not violent. Moreover, because the officers in this case were responding to a tip that someone from that home, namely one of the persons in the room with them, was planning a mass shooting, they had more reason to believe someone dangerous could be in the home than the officers in *Davis* wherethe defendant was only suspected of committing identity theft and fraud. The officers' belief that individuals in the home could be violent and that the officers could be in danger was further bolstered by the ammunition and multiple magazines that were in plain view in the living room as the officers entered the residence. In these circumstances, the officers had a reasonable concern for their safety. Based on these facts, a protective sweep was justified.

---

[4] This suspicion was later confirmed to be accurate.

10

Moreover, in this case, the sweep was brief, lasting only seconds, and was confined only to places where a person may hide, bedrooms and other rooms within the residence. *See United States v. Alatorre*, 2017 WL 2960323 (8th Cir. July 12, 2017); *see also United States v. Silva*, 2017 WL 2589436 (5th Cir. June 14, 2017).

### C. CONCLUSION

For all the reasons stated, this Court should deny the defendant's motion to suppress. The evidence shows that the officers engaged in a consensual encounter with the defendant and obtained his consent before ever walking through the residence. Further, even if the officers had not received consent, they would have been justified in conducting a protective sweep because of the circumstances surrounding the encounter which implicated a potential mass shooting suspect, individuals in the residence being subversive about identifying the suspect in the residence, and the likely presence of firearms in the residence. As such, the defendant's motion should be denied.

                                      Respectfully Submitted,

                                      JESSICA D. ABER
                                      UNITED STATES ATTORNEY

By:          /s/
                                      Stephen E. Anthony
                                      Virginia Bar No. 78246
                                      Counsel for the United States
                                      United States Attorney's Office
                                      919 East Main Street, Suite 1900
                                      Richmond, VA  23219
                                      Phone: (804) 819-5400
                                      Fax: (804) 771-2316
                                      Stephen.Anthony@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/
Stephen E. Anthony
Virginia Bar No. 78246
Counsel for the United States
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, VA 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Stephen.Anthony@usa.doj.gov