IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA

v.                                           Criminal Case No. 3:22cr121

JULIO CESAR ALVARADO DUBON,

Defendant.

MEMORANDUM OPINION

This matter comes to the Court on Defendant Julio Cesar Alvarado Dubon's Amended Motion to Suppress. (ECF No. 36.) Dubon seeks to suppress evidence—specifically, guns and ammunition—Richmond Police Officers recovered from his home on July 1, 2022. Dubon contends that the officers obtained the evidence pursuant to an unlawful search in violation of the Fourth Amendment of the United States Constitution.[1] For the reasons that follow, the Court will deny the Amended Motion to Suppress.

### I. Procedural History and Findings of Fact

#### A. Procedural History

After he was arrested by Criminal Complaint on August 2, 2022, a grand jury indicted Dubon on August 16, 2022, charging him with a single count of Possession of a Firearm by one

---

[1] The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

Illegally and Unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5).[2] (ECF Nos. 1, 15.) The Court held a hearing on the Motion to Suppress.[3] The parties sought the opportunity to file additional briefing following the preparation of a transcript, which the Court Ordered. (Tr. 100–02.) Dubon timely filed his Amended Motion to Suppress. (ECF No. 36.) The United States responded, and Dubon replied. (ECF Nos. 37, 38.) For the reasons articulated below, the Court will deny the Amended Motion to Suppress.[4] (ECF No. 36.)

B. **Findings of Fact**

On July 1, 2022, the Richmond Police Department ("RPD") received a tip that a man going by the name "Chapin,"[5] who resided at 3112 Columbia Street, possessed "an AR-15 and

---

[2] Section 922(g)(5) of Title 18 of the United States Code states, in pertinent part:

**(g)** It shall be unlawful for any person—
　　**(5)** who, being an alien—
　　　　**(A)** is illegally or unlawfully in the United States; or
　　　　**(B)** except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)))
. . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(5).

[3] In addition to argument, the Court bases its findings on the evidence introduced during the Suppression Hearing. This includes Officer Bryan Ferreiras's body-worn camera footage, U.S. Ex. 8, as well as the testimony of Sergeant Brian Rogers and Officer Bryan Ferreiras.

[4] Dubon filed his first Motion to Suppress claiming unlawful search and seizure on September 12, 2022. (ECF No. 25.). This decision renders Dubon's first Motion to Suppress MOOT. (ECF No. 25.).

[5] "Chapin" is occasionally spelled "Chapine" in the record. For clarity and because the parties agree that it is correct, the Court will spell the nickname "Chapin."

2

other big weapons" and was intending to shoot up "schools, events, etc." (U.S. Ex. 11 at 000225; *see also* Ex. 7; Tr. 13, 66–68.) The early afternoon tip, which was in Spanish, came to police through the "language line" interpreter, which helps translate reports from non-English-speakers to the police. (U.S. Ex. 11 at 000225; Tr. 13, 65.) The tipster described Chapin as Black or Hispanic, from Guatemala, and approximately 5'8" and 180 pounds. (U.S. Ex. 11 at 000225; *see also*, Ex. 7; Tr. 13.) The tipster also said that Chapin used to work for a drug cartel. (U.S. Ex. 11 at 000225; *see also*, Ex. 7; Tr. 13.)

Officer Bryan Ferreiras ("Officer Ferreiras"), a native Spanish-speaker, was ordered by his supervisor to call the tipster for additional information. (Tr. 66; *see* U.S. Ex. 11 at 000224.) Officer Ferreiras called the tipster and recorded the conversation. (U.S. Exs. 11 at 000223, 7; Tr. 15.) Shortly after the call, Officer Ferreiras sent an email "Re: "3112 Columbia St[.]" to other investigating officers summarizing the information he gathered. (U.S. Ex. 11, 000222–25.)

Officer Ferreiras reported that the tipster told him Chapin was the tipster's co-worker, and that Chapin showed the tipster "two long guns on [June 21, 2022] . . . . [and that] the first long gun was an AR style with 6 metal magazines and was equipped with a red dot sight under the barrel." (U.S. Ex. 11 at 000223; *see also* Tr. 15, 67.). Officer Ferreiras reported that the tipster said that the "second long gun was a higher caliber than the first" and "[t]he barrel was longer [with] several holes on the handguard [and] a two leg kickstand." (U.S. Ex. 11 at 000223; *see also* Tr. 16, 67.). Officer Ferreiras was told that "Chapin" was "planning on shooting up a large gathering event on July 4th" at an unspecified location. (U.S. Ex. 11 at 000223; *see also* Tr. 16, 66–67.) The tipster also told Officer Ferreiras that Chapin was a former enforcer for the Mexican gang "Los Zetas." (U.S. Ex. 11 at 000223; *see also* Tr.16, 66–67.) Finally, Officer

3

Ferreiras reported by email that the tipster said that Chapin "fires the rifles [throughout] the week in his back yard." (U.S. Ex. 11 at 000223; *see also* Tr. 16.)

The 3112 Columbia Street email was then reviewed by several officers, including RPD Sergeant Brian Rogers ("Sgt. Rogers") and Detective Michael Kiniry ("Det. Kiniry"). (Ex. 11; Tr. 17, 68–69.) Sgt. Rogers instructed Det. Kiniry to travel to 3112 Columbia Street, in Richmond, Virginia, (the "Columbia Street Residence" or "Residence"), (Tr. 13–17, 67–68), "to do a little investigation prior to [the officers] knocking on the door." (Tr. 17.) When Det. Kiniry arrived, he reported seeing—across the street from the Columbia Street Residence—a "huge" party with loud music. (Tr. 18.) Det. Kiniry said there were a lot of people and cars on the block. (Tr. 18.) The officers decided to wait "for the party to kind of die down before [they] . . . investigated further" at the house. (Tr. 18.)

In the meantime, Sgt. Rogers continued investigating the matter. (Tr. 19.) The tipster provided the name of "Chapin's" boss and his contact information. (Tr. 19.) Sgt. Rogers called the supervising employee who confirmed that the suspect worked for him, that the suspect lived in Richmond, and that the suspect's name was Balcarcel. (Tr. 19–22.) Before Sgt. Rogers hung up, he texted the boss a picture of Rolman Balcarcel, who had become the target of their investigation. (Tr. 22.) The supervising employee confirmed that he and Sgt. Rogers were talking about the same person. (Tr. 22.)

Next, Sgt. Rogers called the Department of Emergency Communication (DEC) "to inquire if there had been any calls for service in the area surrounding the 3100 block of Col[u]mbia Street, specifically 3112, within the last several months." (Tr. 23.) Sgt. Rogers did so because "there was information that the tipster had stated that they shoot the guns throughout the week in that 3112 Columbia Street address. So [Rogers] wanted to confirm had there been

4

any calls for service regarding that to verify the validity of the tip." (Tr. 24.) DEC reported several incidents in that vicinity between May 1, 2022, through July 1, 2022. (Exs. 10, 10A.) Specifically, within a quarter of a mile from the Columbia Street Residence, calls to police were made regarding random gunfire on June 9, 2022, and June 20, 2022. (Tr. 24–27.)

Still on July 1, 2022, at approximately 11:00 p.m., Sgt. Rogers, Det. Kiniry, and Officer Ferreiras approached the Columbia Street Residence to conduct a "knock and talk." (*See* Tr. 27, 70.) The party across the street had not ended. (Tr. 27, 70.) Det. Kiniry and Sgt. Rogers wore tactical vests with the word "POLICE" in large letters on the front and back. (Tr. 27; U.S. Ex. 8, at 01:20–01:57.) Officer Ferreiras was in a police uniform. (Tr. 27.) All three officers were visibly armed. (Tr. 27; U.S. Ex. 8, at 01:57.) As the three officers stood on the front porch of the Columbia Street Residence, loud music from the party across the street continued. (U.S. Ex. 8, at 00:57.) After the officers knocked on the door for approximately a minute, Dubon came to the door. (Tr. 28; U.S. Ex. 8, at 01:51; *see* Tr. 70.)

As Dubon began to open the door, Officer Ferreiras made the first contact with Dubon and, speaking in Spanish, asked him, "Can you open the door? Is your last name Ro[l]man? Does a Ro[l]man live here? Or [someone] with a name like, Capin, Cafin, or Chapin?"[6] (U.S. Ex. 8, at 01:56–02:05; U.S. Ex. 8a, at 1.) Dubon replies, "There's one from Guatemala here." (U.S. Ex. 8, at 02:07; U.S. Ex. 8a, at 1.) Officer Ferreiras asked Dubon whether the officers could come inside to speak with him "because from the porch it's hard [due to the loud music playing]." (U.S. Ex. 8, at 02:12; *see also* U.S. Ex. 8a, at 1; Tr. 28, 71.) Dubon agreed and allowed the officers into the Columbia Street Residence. (U.S. Ex. 8, at 02:14; Tr. 71.) Dubon,

---

[6] Officer Ferreiras translated communication between Dubon and the other officers throughout their interaction.

keeping his hand on the open door, waved the officers in, turned on the light in the living room, and said, "Whom are you looking for?" (U.S. Ex. 8, at 02:13–02:18; U.S. Ex. 8a, at 1.)

Upon entering the Columbia Street Residence, the officers walked into a small living room, approximately twelve feet by twelve feet, which had an open doorway leading to the rest of the residence. (U.S. Ex. 8, at 02:18; Tr. 31.) The officers could not see the rest of the residence from their vantage point. (Tr. 32.) Sgt. Rogers noticed a handgun magazine on the mantle to the right of the front door. (Tr. 30.) Det. Kiniry and Officer Ferreiras noticed a handgun magazine and a rifle round on the same mantle.[7] (Tr. 33; Tr. 73.)

When the officers entered the Columbia Street Residence, another person appeared to be entering the living from another room toward the rear of the residence. (Tr. 30, 72; U.S. Ex. 8, at 02:17). The person was later identified as Rolman Balcarcel.

Officer Ferreiras, speaking in Spanish, stated to Dubon, "We're looking for a man, he goes by Chapin, but his name is Ro[l]man, too. Do you know a Ro[l]man?" (U.S. Ex. 8, at 2:23; U.S. Ex. 8a, at 2.) Dubon denied knowing him. (U.S. Ex. 8, at 02:33–02:40; U.S. Ex. 8a, at 2.) Dubon appeared to be groggy and waking up. (Tr. 86.) Officer Ferreiras then asked Dubon if anyone else was in the house. (U.S. Ex. 8, at 02:40; U.S. Ex. 8a, at 2.) Dubon explained that his two sons lived in the house but that they were out. (U.S. Ex. 8, at 02:44–2:50; U.S. Ex. 8a, at 2.) While Officer Ferreiras spoke with Dubon, Det. Kiniry showed his phone, which exhibited a photograph of Balcarcel, to the other individual in the living room. (U.S. Ex. 8, at 02:42–02:55.) Turning his attention to the other individual in the room, Officer Ferreiras asked that person

---

[7] Although no ammunition is clearly visible on the body-worn camera footage, the Court finds this testimony credible. (U.S. Ex. 8, at 02:18)

whether he knew the person Det. Kiniry was showing him on the phone. (U.S. Ex. 8, at 02:46; U.S. Ex. 8a, at 2.) The individual, who was indeed Rolman Balcarcel, denied recognizing the person in the photograph. (U.S. Ex. 8, at 02:50.)

Officer Ferreiras then said in English to Kiniry, "He hasn't seen it," meaning that Dubon had not yet seen the photograph on the phone. (U.S. Ex. 8, at 03:00.) Det. Kiniry presented the phone with the photograph to Dubon. (U.S. Ex. 8, at 03:02.) Dubon denied recognizing the person in the photograph. (U.S. Ex. 8, at 3:06; U.S. Ex. 8a, at 3.)

However, after examining the photograph and the second person in the house, the officers confirmed that the person in their photo was the individual in the living room. (U.S. Ex. 8, at 03:20–3:40; Tr. 36.) The person was identified as Rolman Balcarcel, also known as "Chapin."

Through Officer Ferreiras, Det. Kiniry asked Dubon whether he had firearms in the residence and whether anyone else was in the residence. (U.S. Ex. 8, at 03:43–03:57; U.S. Ex. 8a, at 3–4.) Dubon denied that anyone else was there. (U.S. Ex. 8, at 03:57; U.S. Ex. 8a, at 4.) He did not respond regarding whether firearms were in the residence. (U.S. Ex. 8, at 03:57.) Det. Kiniry then asked Officer Ferreiras to tell Dubon that he was going to check to see if anyone else was in the residence. (U.S. Ex. 8, at 03:59–04:02; Tr. 75.) Officer Ferreiras translated the statement to Dubon, saying "We are going to check to see if there's anyone else in the house." (U.S. Ex. 8, at 04:02–04:04; U.S. Ex. 8a, at 4; *see* Tr. 75.) Dubon responded "Chequeen, no, no hay nadie" which, when translated to English, means "go ahead and check, no, there's no one else." (U.S. Ex. 8, at 04:03–04:05; U.S. Ex. 8a, at 4; Tr. 75–76.) Dubon nodded and, with an upturned palm, gestured forward toward the rooms in the rear of the residence as he made the statement. (Tr. 76–77.) Officer Ferreiras did not translate the statement to Det. Kiniry. (U.S. Ex. 8, at 04:05.) However, after Dubon's earlier statement,

7

Det. Kiniry left the living room and walked toward the rear of the residence to begin a protective sweep. (U.S. Ex. 8, at 04:05; Tr. 37–38.) Dubon then stated, "Well, I understand you can't get into my house without a warrant, then. But . . ." and trailed off. (U.S. Ex. 8, at 04:07–04:15; U.S. Ex. 8a, at 4.) As Dubon began to trail off, Officer Ferreiras said, "We are going to check that nobody's there." (U.S. Ex. 1, at 04:14–04:19; U.S. Ex. 8a, at 4.) Officer Ferreiras did not relay Dubon's statement about a warrant to Det. Kiniry.

Approximately fifteen seconds later, Det. Kiniry returned from a backroom to the living room and declared "It's in here . . . . I got the rifle in here," presumably referring to a rifle matching the description given by tipster. (U.S. Ex. 8, at 04:23–04:41; *see* Tr. 39.)

Sgt. Rogers testified that the officers conducted the protective sweep of the residence because "[they] wanted to make sure that there was nobody else in that house that [the officers] were subject to a threat from." (Tr. 36.) He was concerned that someone in that house might have posed a threat "[b]ecause of the nature of the tip, the specifics listed in the tip that describe[d] multiple weapons to include high-powered rifles, and the fact that when [they] entered the house, a lot of the tip was confirmed[, including that] Mr. Balcarcel was there." (Tr. 37.) Furthermore, he testified that when he "observed the handgun magazine [in] the first room . . . with no weapon present[,] . . . it was [his] belief that there was probably at least a weapon inside." (Tr. 37.) Sgt. Rogers added that, "it was just unknown who else was in that house, who else lived there, who stayed there." (Tr. 37.) The layout of the house also played a role in the decision to conduct a protective sweep due to the "lack of visibility that [the officers] had from the front living room, [they could] not see[]anything other than that room . . . [and] a small snapshot of the hallway with a wall behind it. There was so much unknown that was in the rest of the house." (Tr. 37.) Among other things seized (including from Dubon's bedroom), the

8

officers took as evidence a long rifle on a tripod with a red object at the end of its barrel, a separate long rifle with a scope, a handgun, magazines, and other ammunition. (U.S. Exs. 4, 5A, 6.)

## II. Analysis

The United States has demonstrated that the officers searched Dubon's residence pursuant to Dubon's knowing and voluntary consent. Even if the Court were to presume that Dubon had not voluntarily consented, more than a preponderance of evidence shows that the search would have been valid as a protective sweep. Accordingly, the Court will deny Dubon's Amended Motion to Suppress. (ECF No. 36.)

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The core requirement of the Fourth Amendment is reasonableness, and warrantless entries into a residence are presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980). Thus, when a search or seizure is conducted without a warrant, the United States bears the burden to prove by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment. *Welsh v. Wisconsin*, 466 U.S. 740, 749–50, (1984); *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Kentucky v. King*, 563 U.S. 452, 459 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).

Several carefully defined exceptions to the warrant requirement exist. The United States argues that two of those exceptions justify the officers' warrantless entry into Dubon's residence: (1) Dubon consented to the search, and (2) the police conducted a "protective sweep." Dubon

contends that neither of these two exceptions pertain to the officer's warrantless entry and search. Here, the United States presses the better argument.

### A. The Officers Did Not Violate the Fourth Amendment When They Searched the Columbia Street Residence Because the Totality of the Circumstances Indicate That Dubon Consented to the Search

#### 1. Legal Standard: Consent as an Exception to the Fourth Amendment's Prohibition on Warrantless Searches

When the United States asserts that a search was valid based on consent, the government must show "that the consent was, in fact, freely and voluntarily given." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973) (citation omitted). "This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968). Indeed, in its analysis of whether consent was "freely and voluntarily given," a court must look to "the totality of the circumstances" under a fact-based determination. *United States v. Lattimore*, 87 F.3d 647, 650 (4th Cir. 1996).

In evaluating the totality of the circumstances, courts may consider the "characteristics of the accused," including "age, maturity, education, intelligence, and experience" with the criminal justice system, and the "conditions under which the consent to search was given, 'such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter.'" *Lattimore*, 87 F.3d at 650 (citations omitted). Courts may also look to whether the accused knew he or she had the right to refuse consent, but that factor is not dispositive. *United States v. Boone*, 245 F.3d 352, 362 (4th Cir. 2001); *see also Schneckloth*, 412 U.S. at 231 (rejecting any proposed requirement of advising a subject of his or her right to refuse consent before eliciting such consent).

Further, "[i]n cases where a defendant's response to a request for permission to search is ambiguous, courts have generally relied upon the defendant's failure to protest the search in

10

finding consent." *United States v. Barrington*, 210 F. Supp. 2d 773, 778 (E.D. Va. 2002); *see also United States v. Jones*, 356 F.3d 529, 534 (4th Cir. 2004) (stating that "a suspect's failure to object . . . when an officer exceeds limits allegedly set by the suspect is a strong indicator that the search was within the proper bounds of the consent"). Thus, when determining whether law enforcement authorities have exceeded the scope of a suspect's consent, a court need ask: "What would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno,* 500 U.S. 248, 251 (1991). Finally, a court must take care to evaluate whether a person "effectively revokes" consent because, if such revocation occurs "prior to the time the search is completed, then the police may not thereafter search in reliance upon the earlier consent." *Lattimore*, 87 F.3d at 651 (quoting 3 Wayne R. LaFave, *Search and Seizure*, § 8.2(f)) (citing *United States v. McFarley*, 991 F.2d 1188, 1191 (4th Cir.) *cert. denied* 510 U.S. 949 (1993)).

### 2. The Totality of the Circumstances Indicate That Dubon Consented to the Search

The totality of the circumstances, including Dubon's actions, his age, and the conditions under which he gave consent, demonstrate that Dubon freely and voluntarily consented to the protective sweep of the residence. *See Lattimore*, 87 F.3d at 650.

First, Dubon verbally consented to the search. While Dubon now contends that he never consented, his reply of "Go check, . . . there's no one else" in response to Officer Ferreiras's statement about the officers' intentions refutes his argument. (U.S. Ex. 8, at 4:02–4:05.) "Go check" was an unambiguous statement showing consent, and Det. Kiniry did not begin his sweep until Dubon consented. Dubon's statement was bolstered by his body language as he nodded and gestured towards the area to be searched with an upturned hand. *See United States v. Neely*, 564 F.3d 346, 350 (4th Cir. 2009) (acknowledging that "non-verbal conduct can be sufficient to

11

establish consent" subject to *Jimeno's* objective reasonableness standard and when placing a heavier burden on the government because "consent is not lightly to be inferred").

Dubon's subsequent statement—"Well, I understand that you can't get into my house without a warrant, then. But . . ." and the following shrug of his shoulders—cannot be considered a clear withdrawal of consent because Dubon did not make his revocation unambiguous, nor did he protest the sweep. Dubon stood, unrestrained, next to Officer Ferreiras near the front door. Both Dubon and Officer Ferreiras displayed a calm affect. Standing alone, the use of the conjunction "But" suggests that Dubon could finish his comment by saying, "I'm allowing you to search anyway," as readily as it suggests that he could say "but I don't think I have the ability to say no." Neither Dubon's words, affect, or actions suggest he leaned toward withdrawing consent. Balcarcel, also unrestrained, did not protest or object to any actions by the officers.

To the extent this statement could be viewed as an ambiguous revocation of his consent, "courts have generally relied upon the defendant's failure to protest the search in finding consent." *United States v. Barrington*, 210 F. Supp. 2d 773, 778 (E.D. Va. 2002); *see also United States v. Jones*, 356 F.3d 529, 534 (4th Cir. 2004) ("[A] suspect's failure to object . . . when an officer exceeds limits allegedly set by the suspect is a strong indicator that the search was within the proper bounds of the consent."). Here, neither Dubon nor Balcarcel protested. Dubon never told the officers to stop or to get out of his home. He simply stated in a calm voice, "Well, I understand that you can't get into my house without a warrant, then. But . . .[,]" and then shrugged. A reasonable person would not have understood that Dubon's consent had been revoked through a declaration that he knew his rights. *See Florida v. Jimeno*, 500 U.S. 248, 251 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person

12

have understood by the exchange between the officer and the suspect?") Indeed, Dubon can be seen voluntarily walking with the officers to his bedroom to speak about some of the evidence there. (U.S. Ex. 8, at 04:50–05:20.)

Second, the conditions under which Dubon consented do not suggest he was operating under any coercion or duress. *Compare United States v. Gomez-Zunun,* 751 Fed. Appx. 374, 377 (4th Cir. 2018) (noting that four agents wearing bulletproof vests and side arms did not coerce the defendant's wife to consent to a protective search when they conducted a knock and search at her home because they did not act aggressively, did not detain or arrest her, did not exhibit threats or commands, and she was not "particularly susceptible to coercion"), *with United States v. Robertson,* 736 F.3d 677, 680–81 (finding that the defendant's "begrudging submission to a command" was not voluntary consent when armed officers were immediately accusatory, restrained defendant's movements, and created a situation in which the defendant's "only options were to submit to the search peacefully or resist violently"). Dubon, an adult, allowed the police into his home, calmly responded to the officer's questions, and made a statement suggesting that he understood his rights. While there were multiple armed officers, the officers remained calm and reserved throughout their interaction with Dubon. They used a Spanish-speaking officer to notify Dubon why they were there, Dubon and Officer Ferreiras both spoke in a conversational tone, no one raised his voice during the interaction, and the officers never displayed force or removed any weapon out of its holster. As noted, neither Dubon nor Balcarcel were restrained by the officers prior to the search. While Dubon appeared groggy, as if he had just been woken up, (Tr. 86), nothing suggests, nor does he directly argue, that this or that any other "personal characteristics made [Dubon] particularly susceptible to coercion." *See Gomez-Zunun,* 751 Fed. Appx. at 377. The record does not remotely suggest that Dubon's consent was a

13

"begrudging submission to a command" or that his consent was in any way coerced or involuntary. *See Robertson*, 736 F.3d at 680–81. Moreover, the interaction between the initial knock on the door and the discovery of the rifles in the bedroom took an utterly reasonable period of time: about three minutes and fifty seconds.

Thus, the totality of the circumstances, including Dubon's actions, characteristics, and the conditions under which he gave consent, altogether demonstrate that Dubon freely and voluntarily consented to the search of the residence. *See Lattimore*, 87 F.3d at 650.

### B. The Officers' Warrantless Search of the Bedroom Where They Found the Firearm Could be Justified as a "Protective Sweep"

Given that the Court holds that Dubon consented to the search, the Court need not reach the question of whether the protective sweep was valid in order to deny Dubon's Amended Motion to Suppress. However, the Court, even if it were to determine that Dubon had exercised an ambiguous withdrawal of his consent to search, would find that the officers conducted a valid protective sweep.

#### 1. Legal Standard: Protective Sweeps as an Exception to the Fourth Amendment's Prohibition on Warrantless Searches

In *Maryland v. Buie*, the United States Supreme Court articulated the standard the police must satisfy in order to conduct a "protective sweep" of a home: incident to arrest, an officer can "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched" without probable cause or reasonable suspicion. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). Beyond that, however, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the . . . scene." *Id.*

14

The scope of a protective sweep "extend[s] only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. In addition, the sweep may "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335–36. Importantly, a "[l]ack of information cannot provide an articulable basis upon which to justify a protective sweep." *United States v. Jones*, 667 F.3d 477, 484 (4th Cir. 2012) (quoting *United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996), and noting accord with *United States v. Moran Vargas*, 376 F.3d 112, 117 (2d Cir. 2004); *United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999)).

### 2. The Officers' Warrantless Search of the Bedroom Where the Firearm Was Found Was Justified as a "Protective Sweep"

As a preliminary issue, the Court addresses Dubon's argument that a protective sweep may only be performed in conjunction with a search incident to arrest, thereby invalidating the protective sweep here because it was conducted prior to arrest. While the Fourth Circuit has not addressed in a published opinion whether a protective sweep under *Buie* may be predicated on lawful presence rather than incident to arrest, it has signaled its receptiveness to the proposition, noting that "[t]he vast majority of circuit courts to have considered the issue have upheld protective sweeps conducted in non-arrest situations in which officers are lawfully on a defendant's property." *United States v. Portis*, 407 F. App'x 669, 671 (4th Cir. 2011). In *Portis*, the Fourth Circuit affirmed a protective sweep prior to arrest where officers had reason to believe they were in danger due to the presence of firearms. *See United States v. Portis*, 407 F. App'x 669, 672 (4th Cir. 2011) (holding that a protective sweep was justified when officers had reason to believe that defendant had firearms in his house and had just shot at someone, were aware that the defendant was both a person of interest in a homicide investigation and an army-trained "expert marksman," and had reason to fear that he may have been conferring with an armed

15

associate or hiding a gun to which he would have had easy access to shoot at departing officers if they did not arrest him). This Court agrees with one district judge who has observed (albeit also in unpublished fashion) that courts expanding the protective sweep doctrine to lawful warrantless entry into a home because such entry "creates a risk of harm similar to the risk accompanying an arrest" employ a rationale that the Fourth Circuit would likely follow. *United States v. Osiomwan*, No. CRIM. WDQ-12-0265, 2013 WL 2458459, at *7 (D. Md. May 22, 2013), *aff'd*, 593 F. App'x 194 (4th Cir. 2014). The Court would expand the *Buie* protective sweep doctrine to the circumstances at bar.

In order for a protective sweep to be valid, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334. Here, Sgt. Rogers testified that they conducted the sweep because "[they] wanted to make sure that there was nobody else in that house that [the officers] were subject to a threat from." (Tr. 36.) He was concerned that someone in that house might have posed a threat "[b]ecause of the nature of the tip, the specifics listed in the tip that describe[d] multiple weapons to include high-powered rifles, and the fact that when [they] entered the house, a lot of the tip was confirmed[, including that] Mr. Balcarcel was there." (Tr. 37.) Furthermore, he testified that when he "observed the handgun magazine [in] the first room . . . with no weapon present[,] . . . it was [his] belief that there was probably at least a weapon inside." (Tr. 37.) Also, Sgt. Rogers testified that the dimensions of the house played a role in the decision to conduct a protective sweep due to the "lack of visibility that [the officers] had from the front living room[; they could] not see[]anything other than that room. . . [and] a small snapshot of the hallway with a wall behind it." (Tr. 37.)

The Court finds that the record shows that the police had "specific and articulable facts" to undergird a reasonable suspicion that other dangerous individuals could be in the house. *See Maryland v. Buie*, 494 U.S. at 332. A tip about a potential mass shooting in the next few days had been substantiated, through investigation, in significant ways once they were invited to enter 3112 Columbia Street. The tipster's description of Chapin and where he worked matched Balcarcel, the person the officers ultimately decided was the target of their investigation. The officers were in a small room with limited visibility. Upon entry, a magazine without a gun and rifle ammunition were observed in the living room. Dubon denied knowing the person in Sgt. Rogers's photograph even though it was Balcarcel. Balcarcel failed to identify himself in the photo. The officers were in a small room with limited visibility. Given that the tip warned of mass shootings and dangerous weapons, the officers reasonably took just 15 seconds to sweep only the locations where a person might hide. *See Maryland v. Buie*, 494 U.S. at 335.

Accordingly, the Court concludes that, even if consent to search had not been voluntarily given, the warrantless search of the bedrooms where the firearms were found would be justified as a protective sweep.

### III. Conclusion

For the foregoing reasons and for the reasons, the Court will deny Dubon's Amended Motion to Suppress. (ECF No. 36.)

An appropriate Order shall issue.

Date: 06/21/23
Richmond, Virginia

/s/
M. Hannah Lauck
United States District Judge